I'm gonna assume you know the lighting system so whenever you're ready Mr. Cooper. Good morning your honors, may it please the court, Kirk Cooper on behalf of the appellant Teresa Esparza. The McDonnell Douglas framework for analyzing discrimination cases was never intended to be applied in a rigid mechanized or ritualistic manner. That's what this court said in Debasi versus Motiva Enterprises just a few months ago when it reversed a district court ruling in which the district court took a piecemeal approach to evaluating the element of pretext. We contend that the district court here erred by taking the same piecemeal approach and we asked this court to reverse the summary to the sex discrimination claim. The district court erred in its pretext analysis in several ways most particularly by disregarding the statements of Mrs. Esparza's supervisor Matt Elliott which the district court itself recognized were indicative of sexist animus. The district court first disregarded those comments on the basis that Mr. Elliott was her supervisor at the time of an interdepartment transfer and under prior Fifth Circuit precedent this interdepartment transfer was not actionable because it was not the equivalent. Later we moved for rule 59 relief because the law changed under Hamilton versus Dallas County. The United States Supreme Court has confirmed in Muldrow versus City of St. Louis that that ultimate employment action test is no longer viable. The current test now is whether or not there was a change to the terms and conditions of employment. So our argument was... The district court got that right? Yes and the district court did find that the... Just help from me because it's a tangled long story, her departure eventually. What was the adverse event, employment event that the district court assessed A&M's conduct against? Was it the PIP? Was it the transfer? Was it the termination? So what did the district court assess the conduct against? Yes your honor. So in the original opinion the district court found that the PIP and the termination were the operative employment actions. Later when we filed for rule 59 relief we said the transfer is now actionable. The district court said okay I recognize that there has been a change in the law. Maybe this transfer is actionable but I find that the statements of Mr. Elliott are still not relevant because he was not the ultimate decision-maker. The CEO, Reminder Man, was the ultimate decision-maker. And your argument to us is focused on which of those operative events or do you want to say all? Our argument is focused on on both, right? I mean our position is that you have to take the totality of the circumstances into into account based on on her termination which we think was sex discrimination and retaliation for filing an EEOC complaint. But also the the transfer itself is now sort of an actionable, well not sort of, it is now under circuit precedent. So just two quick fact questions related to those. You don't dispute that prior to the termination her sales were about at zero. There may have been, you may argue different causes, but just factually her sales were very very reduced prior to the termination? Yes I believe the record does show that during that particular quarter at the beginning of 2020 her sales were down. Way down. I believe that's correct. Okay and likewise for the transfer it's it's an undisputed fact that she actually did have more audio-visual skills than anyone else. Is that fair to say? I'm not saying that's determinative of the case but just trying to understand the context of both employment decisions. Sure so her sales mix I believe leaned more towards audio-visual sales and core sales. You know how much that lean is is sort of a But more than any other one employee there? I don't recall if the record says that she was more than other. I know that her sales mix did lean more towards audio-visual. This wasn't a new product line that she was introduced to when she transferred was it? Yes that's correct so she you know she had some prior experience with audio-visual but the record also shows that the company's audio-visual market only constituted about 10% of its of its revenue so it was still sort of an untested market that they hadn't really developed. Well they didn't they buy an audio-visual company and that's the reason one of the reasons anyway that they reorganized? Yeah that's one of the reasons that they say they reorganize yes is that they had acquired an audio-visual company and so they were looking to try and expand that. Another factual question prior to the transfer Ms. Esparza said she had about 10 to 12 million I guess potential sales in a pipeline what was the evidence of that in the record? That was just her testimony as that she had said that she had about 10 or 10 10 or 12 million in the pipeline I don't recall seeing anything specific from the other side where they dispute that or say it I'm I can't remember off the top of my head but that is her testimony that that she had a well a well-developed pipeline and that during this transfer process A&M started you know divvying up her accounts that that particular pipeline that she had built up. When you get to the pretext area did was there any evidence that the company treated men more leniently than they did her on being given grace to the sales goal? I'm not sure if there's evidence of that but we do know that there is evidence that other members of the AV sales team the Sobota and Babich who were in the Denver and Albuquerque offices. In a different territory? Well there was a testimony I believe from Patricia Barton who was in the Albuquerque office that while they were serving different territories that kind of functioned together as one unit in other words if someone had a lead in one area or another they would they would sort of help each other out. Was there data about how many what their sales were? I don't believe there was your honor. I do know that there Mrs. Mrs. I'm sorry Mrs. Sparta's testimony was that Sobota and Babich were receiving more leads than she was to quite a bit more leads and so you know our position is that if you take a look at these AV sales team they're all selling the same products right they're saying it's all selling audio-visual products. I believe they're all answering to Duffy but Sobota and Babich are allowed to have a different mix where they're allowed to sell additional products whereas Esparza was not. How can you use those two men as comparators when you don't have any data showing how they were treated? I'm sorry your honor can you repeat that? How can you treat how can you claim that those two men are comparators when you don't have any data to show that they were treated either more or less leniently than the plenum? So I believe that there is data in the form of testimony that they were receiving particular extra leads that that she was not and so and that they were allowed to have a sales mix that consisted not just of AV products but of AV products and and other products. So while there may not be direct sales numbers to my knowledge I do know that there is evidence in the record that that shows they were getting leads when she wasn't and so that that would constitute disparate treatment in our view. And on the leads all you have is her testimony without any backup data? I believe that's correct. On the issue of whether or not the transfer is still in I believe the other side argues that at some point she disavowed that the transfer was a part of the record. Do you have a response to that? Yes your honor. So as Judge Higginson was saying there's kind of a weird procedural history here. So when the response to summary judgment originally came out Hamilton had not come out and so the law in this circuit was that unless it's the equivalent of an ultimate employment action that was in demotion or something along those lines that it wasn't actionable. So at no time post Hamilton has she ever disavowed that as a claim? No your honor and in fact even before this she included it in her EEOC complaint. She included it as a factor in her summary judgment briefing. She's repeatedly advanced the transfer as a ground it's just that before Hamilton circuit precedent kind of bound our hands but after Hamilton we were allowed to raise that and that's why we raised that in the rule 59 motion. You of course had to offer evidence that that their performance sale was pretext. That evidence you say is an amalgam of things starting with Elliott's comment about being over emotional? Yes your honor. That comment came months after the transfer so that would only relate to termination? Fair or wrong? I believe that the comment was made during the it was a performance evaluation where the comment was made during the performance evaluation. But she'd already moved over to the AV side. I think that was during the process of the transfer. I believe that's that's the sequence of events is that that was during the process of the transfer and in addition to the comment from from Elliott that the district court found. And that comment really is what are the exact words that he has said to have uttered? The comment was that and I don't have the exact words with me. Pretty important right this is really at the core of your argument. Yes your honor. What did he say exactly? That she was you know essentially over emotional and emails. Did he say over emotional or just emotional? Just I think it was just emotional I think you know the conveyance was that that. So her boss for the AV section says you're too emotional in your emails and it was specifically related to her emails with another individual correct? Yes. Okay and and is it correct that as far as it did apologize for some of the tone in the emails? My understanding is that she she said that she would work on that yes. Yeah so a boss saying the emails are a little emotional I'm not sure where I guess your point is that there's an inference of sex discrimination in that because emotion ties to women? Well the district court found that there was a inference of sex discrimination because it traffics in negative stereotypes about women but that's not our only evidence of. What's your strongest evidence of pretext? So the strongest evidence of pretext is is all the the factors taken together. So for example the same supervisor that made these comments was interfering with her client relationships. You know the company was basically taking away all of her leads giving male counterparts leads when she was not getting leads. You know she had made complaints to Duffy. Duffy said that he didn't investigate he admitted you know Marilys Stevens who is the HR person said there is a policy that if a complaint is made it needs to be investigated. He admitted you know I just thought she was venting which again you know another comment that tends to go towards the women are over emotional stereotype and and just the fact that there are other factors indicating that the reason for the termination there's there's reason to cast doubt on that. So A&M is saying well it's her sales numbers and her sales numbers show that you know performance is bad because she's you know a bad salesman or she's you know not making efforts etc etc but there's also evidence in the record to show that her pipeline was basically taken away from her. She's being asked to start up in a new unproven area for the company. She's not being given leads. Her existing clients are being divvied up. Those allegations are sort of setting her up to fail. Yes your honor. Duffy ends up firing her right? Yes your honor. She was paid double commissions on her last six months of work though wasn't she? I'm sorry? She was paid double commissions on her sales for the last I think three or six months of her work. In terms of the offer of what what they would offer her if she was able? I mean to offset the idea that she wasn't given leads when she started or didn't have a didn't have a backlog, she was given double credit for sales before before the transfer. Sure and and so I would like to point the court to testimony from Duffy. We cited this in our motion for summary judgment response. This is ROA 1614 and Duffy says in his deposition that the lack of the sales during quarter 1 of 2020 was due to the pipeline issue in the last quarter of 2019 and he does make comments suggesting that well we should have helped her map that out better you know that and and he's asked and would not having a pipeline in quarter 4 have impacted her ability to make her numbers in quarter 1 and he says yep so in terms of that's that's seeming to assume a sales head is sort of building in internal fail for his own sales so so the fact that that that he would want them to not meet their own targets that's the theory so where does it trace back to a discriminatory intent well and there's there's a comment about emotional it's it's the comment about emotional it's the fact that mrs. Sparza had complained to Duffy prior to the transfer prior to all this about her disparate treatment by Matt Elliott by others she's being excluded from dinners she's being excluded from certain opportunities yes last question because you will have rebuttal but what did you assert below to the district court the cat's paw theory or is that coming up in your brief for the first time here to us so I see that my time has expired my answer the cat's paw theory has been raised in response to an issue that the district court raised sua sponte and the rule 90 or I'm sorry the rule 59 opinion that issue was essentially we filed the rule 59 saying Hamilton has changed the law this transfer is actionable Elliot's comments were found so therefore we need to link them up the district court discounted Elliot's comments by saying well yes Hamilton has made this actionable but I'm going to find that the actual decision maker on this was not Matt Elliott it was CEO remainder man and so no one had addressed that you raised it at that point but only as to the transfer as an adverse employment you didn't ever raise it in the context of her termination yes or no we we did not raise it because it was not made an issue until the district court issued it's nothing to do with termination right that's always been ultimate employment action so Hamilton didn't change the playing field as to the termination right and so in terms of the termination argument once that opened up the termination argument the district court said okay I'm going to shift focus from who the actual decision maker was to the CEO which neither side had argued and so the issue is that the district court raised that sua sponte in terms of who the actual final decision maker was you'll get your full rebuttal time when you say no one had ever argued the CEO I thought throughout you had stressed the CEO's comment we're gonna make an example I thought that's been in this case from the beginning that's been for the retaliation yes that's correct all right thank you counsel thank you run morning your honors may it please the court Michael Rudd for advanced network management A&M for short Teresa Esparza was a salesperson for A&M who was put in the best position to succeed during a company-wide reorganization of the sales force but due to an unprecedented drop in her sales she ultimately had to be let go during this argument I'd like to talk to you all about how that lateral transfer to a be sales and the ultimate termination are not the products of discrimination or retaliation turning first to the sorry about that speaking first about the speaking first about the transfer I'd like to make three points first that the comment by Matt Elliott is not evidence of pretext because it occurred after the transfer decision was already yes absolutely your honor there's no even miss Esparza's subjective statements which have come up a couple of times this morning and I would point out to the court that speculative and conclusory statements are not summary judgment evidence but she doesn't even make that argument there's no disputed facts that the decision to break out all of the sales organizations so that they had subject matter experts in each product line occurred well before and then post that the decision to put miss Esparza into AV because she was the person who was doing the most AV work occurred that occurred in about October November time frame there's some intervening causation issues in there and then the transfer itself became effective on January 1st and then Matt Elliott delivered miss Esparza's 2019 performance review in January after the transfer had already been occurred and was effective well after the decision had been made but when exactly was the email with the that's a little too emotional it was not an email your honor it was a it was in her performance review in the performance review and my recollection of it and pardon me if I quote he challenged her to be more thoughtful in her email communications because at times her emotions are clear paraphrasing of course and I would point out that my colleague has not asked but it seems inherent that miss Esparza would like this court to create a per se rule that the word emotion is evidence of gender animus and to that I would say that no court has ever made such a decision understanding the historical nature of the word I tried carefully but I would like to point out that the district court relied on the Tenth Circuit decision in O'Shea but the Tenth Circuit decision in O'Shea is easily distinguishable from this case because in that the fact pattern of that situation was there was a comment about emotion but the commenter also rarely made fun of his wife and other women and pardon me I want to quote this so that I don't get it wrong he said that women in general were incompetent stupid and scatterbrained and so I would just point that out that the O'Shea decision out of Tenth Circuit is magnitudes worse than what we have here. Here we have Matt Elliott's 2019 performance review and then we also have Mrs. Sparza talking about Ian Logan and in response to why that criticism was made Mrs. Sparza says Ian Logan was quote very sensitive and that's coming out of record citation 2465 and so to that I would just say that at best in this case the word emotion is gender-neutral because it's going both ways. Was there any evidence that Elliott had any influence in the termination decision? No your honor and thank you for bringing me back on track and so first the answer to your question is absolutely no there's no evidence of pretext and there's no evidence that Matt Elliott's comment impacted the decision of the transfer or the termination. I'd like to yes Judge Higgins. Well no following up on that breaking the two events apart it didn't have an influence on the transfer because it occurred months after the transfer correct but you're not pressing but tell me if you are that she's a stop from even arguing that the transfer is an adverse event in other words the district court found Hamilton extends to that you aren't here telling us somehow she's a stop from acknowledging a change in law or are you saying the district court was legally erroneous in how it applied Hamilton? I think that that's a very close call your honor I think that the judicial estoppel argument that we've raised is viable. But you're not pressing it as your first argument? It's not our best argument. Sure I see it's viability but anyway. Well to follow up on my colleagues comments on it Mrs. Sparza raised the transfer as an adverse action her EOC charge her complaint discovery every step along the way until we got to summary judgment and then she dropped it because it was a hard argument to make and then post Hamilton it comes back in the thing about it is the Hamilton didn't change the district courts analysis because the district court assumed the prima facie elements were met and so whether her transfer was a adverse action or not it wouldn't have made a difference for the district court's analysis. Going back to more in the AV position than the one she had before? She was when she was transferred to AV her base salary went up from $60,000 a year to $65,000 a year and her projected commissions were more than she had ever made during her time with A&M. Of course that didn't ultimately come to fruition speaking to the qualification element of her prima facie case and the timing of things in November when this transfer to AV sales and the breakout of the sales organization was becoming real she told Sarah Cancelliari that she was going to quit in January and then she started turning down cabling leads. A cabling lead. So the Clint ISD deal, independent school district I think, was a lead that was being sent to Mrs. Barza by Cooper Heflick at the time and it was a solid of a sale if she would have just done the paperwork she would have gotten paid on that but she turned it down. When you characterize she was going to quit there's no evidence later that she did quit there no right there there's no evidence that she refused to work and the related question is did she use those exact words I'm going to quit or I'm thinking about quitting? What do you remember? So to answer your first question no evidence that she actually quit but for her sales going from 1.2 million and closed to 19,000 and closed. But that that does suggest she's still working. It suggests that she is doing what's coming to her. In light of your second question my recollection that the actual text to Sarah Cancelliari was I'm going to quit in January please don't tell anyone. I want to hit on the cat's paw theory that you raised Judge Higgins and the waiver issue. The district court did not sui sponte raise a cat's paw theory. The district court merely stated the uncontroverted fact that Matt Elliott was not involved in the transfer decision. There's no dispute to that and so far as waiver goes this court has held that a litigant can't allude to an argument they have to push it and this cat's paw argument was not pushed at the district court and the district court did not sui sponte raise it. I would say if the district court had sui sponte raised it it would have cited this court's decision in Zamora and gone through the elements of Zamora which are that Matt Elliott would have had to have made the comment for the purpose of having remander man transfer Mrs. Sparza to A.B. and that his comment was the but-for cause of the transfer. There's no evidence of either of those things and just to wrap a bow on this there's no evidence of either of those things because that comment occurred after the fact. Turning next to the termination which is largely based on retaliation. Mrs. Sparza's theory at least is that it's based on a retaliation. I just want to point out the legal standard going into summary judgment of pretext and a very fresh case out of the Texas Court of Appeals which really doesn't change anything but it reinforces what has always been the standard and that is that to avoid summary judgment there must be evidence of suspicious timing and significant evidence of pretext. That's the Johnson and Capstone logistics case. This court has previously held in Wallace v. Sutton that there must be substantial evidence of pretext and evidence is substantial if it is such a such quality and weight and reasonable that a reasonable and fair-minded juror in the exercise of impartial judgment might reach different conclusions. Let me ask you one thing you know I know it's plaintiff's burden to establish pretext but I kept looking for data showing what her replacement did after she left to just compare you know what whether she was just dogging it and not making not making her calls or whether this was a bad territory or what. To answer your question judge directly there is no evidence in the record of what her replacement in the El Paso Territory did. What is in the record is that she went from 1.2 million in total sales 700,000 of that was AV. The you know she talks about her pipeline a lot with no supporting evidence but if she had 10 million dollars in her she was was selling AV before she went to A&M at her prior job. AV was her expertise. Let me ask you this, do they sell usually a small number of large sales or do you have a large number of small sales? Over the course of Ms. Esparza's career with A&M it was a mixture of the two. There was a very large sale of AV equipment that was for the William Beaumont Hospital at the military installation in El Paso that helped Ms. Esparza make her 2018 quota but other than that it's a mixture of big sales and little sales. And to what extent were leads responsible for those big sales? I mean I can just visualize that a military base might call a company and say I'm interested in this and then the company would call a representative and say you need to go see these people. That William Beaumont Hospital was a sub-subcontract deal. EP Techworks was a subcontractor for the contractor doing work on the hospital and A&M was the sub-subcontractor for EP Techworks who coincidentally is where Ms. Esparza went to work after her employment with A&M ended. And just to speak since we're there about Reminder Man's comment. I mean can you give me some idea of how leads worked? The leads? Yeah, I mean to what extent did the leads, were the leads responsible for sales? Generally speaking, by and large, the salesperson is responsible for generating their own leads. That's their job. There are rare instances that the Clint ISD deal that Ms. Esparza turned down is an excellent example of this where a client will come with a particular need and they're requesting a proposal. And so those things are more rare. Ms. Esparza talks about leads but she doesn't identify any leads. She doesn't identify why she should have been getting leads in Albuquerque and Denver. There's no record evidence of any of this. It's merely Ms. Esparza's speculation and conclusionary statements which aren't summary judgment evidence. I think you were about to get to my biggest concern about the retaliation claim. I think you were going there. EEOC charge filed in February. Yes, Your Honor. Sales down to zero by May. Yes, Your Honor. Fail, fired in July. Yes, Your Honor. So that does look like a significant, legitimate, non-discriminatory reason. But then you've got what looks like the ultimate proof of a threat. The CEO's comment with a slideshow. We're going to make an example of this one. Now, so is your entire argument that that doesn't even create an issue of fact because it occurred after she was terminated? Because you would agree that had that occurred right before termination, that would make this a classic case of retaliation, correct? If it had occurred right before termination instead of a year after the fact . . . CEO. Yes, Your Honor. I think under that hypothetical, that probably would be a much harder argument for me to make. In this case, though, going back to the Rubenstein elements, the district court focused on the proximity and time. And this court's decision in Trotter to say that a year afterwards is not enough to find proximity and time. Addition to that . . . I disagree with the truism that a year after is not proximate in time. I don't agree with the notion that Remenderman's comments, which for the purpose of summary judgment, we're not opposing. But I disagree with the notion that that is of such . . .  impact that it would slight the whole situation. And I say that because the undisputed evidence is that after Mrs. Sparser left A&M and she went to work for EP TechWorks, she was going to A&M's clients and using her lawsuit to compete against A&M. This slide show doesn't say we're going to make an example of her. And to be completely fair, if you really read Patricia Barton's deposition testimony, she doesn't say that either. She says that it was her impression that that was what was being said. So she, Ms. Barton, was reading into . . . Mr. Mann said this. Her impression of what he said was make an example. So that's . . . there's a step in between there that we're really missing. It gets back to that speculative and conclusory statements that aren't summary judgment evidence. But tying it all the way back to the ultimate issue, whether a rational juror could find that that statement a year after, when Mrs. Sparser is using her lawsuit to compete, is made for retaliatory reasons. The only inference that the undisputed facts create here is that Mr. Mann made that comment, assuming that he made it at all, because he was upset that she was going out and using the lawsuit to compete. And it also . . . of minor importance, but that slide show was at a leadership meeting. This wasn't sent to all of the rank and file employees to the company. And Mr. Mann's undisputed testimony on that issue is that he told them so that they would know that Mrs. Sparser was out trying to get at the clients. And, you know, just so you know, he didn't want his leaders to be caught off guard when they hear this from clients. And I want to . . . I missed a point on the transfer, but it ties into termination. This Court's decision in Taylor v. Peerless was that even assuming there was some gender animus or retaliatory animus, if the decision would have been made anyway, then summary judgment is still appropriate. In this case, we've got . . . speaking toward the transfer first, there were . . . the whole company was broken up. Every salesperson lost some clients, gained some clients. They were siloed into product lines, into expertise. And so Mrs. Sparser would have been transferred no matter what, whether it was to A.V. sales or whether it was to core sales. Transferring Mrs. Sparser to A.V. sales, it just put her in the best position to succeed because she had $700,000 of A.V. sales versus $500,000 of core sales. And that was her expertise even going into A&M. Well, that $700,000 consisted mostly of one big sale, though, didn't it? That was in 2018, Your Honor. Okay. I don't believe that there's any record evidence of how that $700,000 . . . I stand corrected. There is record evidence of what that $700,000 was. It's a spreadsheet . . . give me just a second here . . . ROA 780 to . . . no, I'm sorry. ROA 799, Your Honor, is the record citation for what the $700,000 was. That same thought process, though, applies to the termination because if she was going to be terminated anyway, she had only made $19,000 in sales by July, it wouldn't make any sort of a difference. And there's also no evidence that remainder man had any influence on the decision. I see that I'm out of time. May I briefly . . .  I asked you. In conclusion, Your Honors, Ms. Esparza has not shown that discrimination or retaliation were the reasons that she was transferred or terminated. A&M asks that this Court affirm the well-reasoned decision of the District Court. Thank you. Thank you, Counsel. Mr. Cooper or Roboto? May it please the Court. So, I'd like to talk about the retaliation point, but before I do, I want to give the Court some record cites. My friend on the other side had said, in response to questioning from the Court, did Ms. Esparza say that she was definitively going to quit, or did she say she was thinking about quitting? That information is at ROA 1802 to 1803. She's being questioned about this text message where she says she's going to quit in January, and then the question is questioned. So, you were planning to leave in January of 2019. Answer, based on the stress level, on emotion and mental, and then question, okay. Answer, stress that I was going through, I was considering it. So, she doesn't say, I'm definitely going to quit. She says, I'm under a lot of stress, so I'm considering it. So, that . . . It doesn't characterize the text, but there's evidence of what the actual text says? There is a text that says, Sarah, I'm going to quit in January. So, she's asked about that, and she says the context behind that question is, I was under so much stress that I was considering it. So, in terms of whether or not she was going to . . . That's a fact question. That's an issue of credibility and demeanor. Now, as opposed . . . Excuse me. As for what Reminder's man said at the meeting, and whether or not he said that he was going to make an example, I know there was a question. I'm going to point the court to Patricia Barton's deposition. This is ROA 2049. Question. At any point during Reminder's presentation, did he say they were going to use a lawsuit to make an example out of Teresa? Answer, I believe they did. So, there is testimony to the effect that Reminder man made this statement. We're going to use this lawsuit to make an example out of Teresa Esparza. Now, in terms of the retaliation elements, Judge Higginson, you had asked about Trotter. We believe that the proper application of Trotter . . . First of all, I do want to caveat it by saying that it's not a published opinion, so it's not technically precedential, but it does apply this four-factor test. We don't believe that treating the time element as dispositive here keeps in the spirit, basically, of the overall analysis of pretext. Pretext is supposed to be a totality of the circumstances test. The district court said that everything else about this statement shows retaliatory intent. You have it from the CEO. You have him, you know, making a direct threat. As your Honor pointed out, if this comment had been made before the termination, you know, that would be the end of it. Trotter is distinguishable because Trotter doesn't say this was just a matter of this comment, which was, you know, the use of a racial slur under somebody's breath at a restaurant after the termination, that that comment was dispositive because it happened a year afterwards. It says, you know, this comment came outside the context of the workplace. This comment came, you know, in an ambiguous context where it was not clear that this was connected in any way to the employment action. And so, we're going to treat this as not legally sufficient in our analysis. Here, the entire situation is totally different. We have the company's top official, CEO, at a meeting, flashes a slide on a PowerPoint presentation that says, Teresa sparks a lawsuit. We have testimony from Barton saying, he's saying he wants to make an example out of her. And the district court said, I would find this dispositive, but for the fact that this time element has lapsed too far. When was the meeting? The meeting was about a year after the termination. It was August. So a year and a half after the. I think it was like August 2021, if I'm remembering. And she filed her EEOC charge in February of 20? That's correct. So, but, you know, by way of analogy, I mean, if we consider this as like a, you know, for example, a criminal case. If you're trying a murder case and you have a defendant that says, you know, that guy had what was coming to him, makes all sorts of threats, you know, five years after the fact. That evidence is admissible at trial. That evidence can be used to show evidence of retaliatory intent. And so it doesn't make sense in this employment context where this court has said in DeBassi, we're not supposed to have this mechanized, ritualistic application where we go element by element and try to shoot off individual elements. What's your, have you, from the, scanning the circuit in Westlaw, what's your best analogous case where the top guy says something bad, but it's months, even years after? Do you have a case that is supportive as opposed to just distinguishing trotter? Sure. I was not able to find anything specific on that point. I think this is sort of a unique situation in applying this sort of unique test. But we would encourage this court, because we do think it's an important issue of law, that in applying this four-factor test moving forward, that the time element not necessarily be dispositive. This is a totality of the circumstances test and not an individual test. And so for those reasons, we would respectfully request that this court reverse the summary judgment. Thank you. Thank you both very much. We appreciate it. It will help us. And we will hear the last case for the day.